No. 31,301

Mary Hoyne et al., *Appellees*, v. Eleanora M. Schneider, *Appellant*.

(27 P. 2d 558.)

Opinion filed December 9, 1933.

*Z. C. Millikin,* of Salina, for the appellant.

*David Ritchie,* of Salina, for the appellees.

The opinion of the court was delivered by

Thiele, J.: This was an action in form to construe a will, actually to determine the amount in acreage of lands going to certain devisees under decedent's will.

Timothy Hoyne by patent from the United States obtained title to the south half of the southwest quarter of section 18, township 14, range 3, Saline county, containing 85.11 acres. He also by patent from the United States obtained title to the north half of the above southwest quarter containing 85.09 acres. He also obtained title to other real estate not involved in this action.

Timothy Hoyne died May 24, 1915, leaving a last will which was thereafter admitted to probate in Saline county, Kansas. So far as is necessary to note here, the will devises lands as follows:

1. To his son John the W½ of the SW¼ of sec. 18, twp. 14, rg. 3 west of the 6th P. M.

2. To his son William the E½ of the SW¼ of sec. 18, twp. 14, rg. 3 west of the 6th P. M.

3. To his son Tim the W½ of the SE¼ of sec. 18, twp. 14, rg. 3 west of the 6th P. M.

4. To his son Thomas the E½ of the SE¼ of sec. 18, twp. 14, rg. 3 west of the 6th P. M.

The name of the county where the land lies is not given, although preceding the above devises he gives his son Phillip other land in section 19, township 14, range 3 west of the 6th P. M., Saline county, Kansas.

Subsequent to the death of his father, William Hoyne died intestate, leaving as his heirs the plantiffs in this action. In their petition plaintiffs allege that the said southwest quarter contains 170.20 acres according to government survey; that under the terms of the will of Tim Hoyne they are the owners of the east 85.10 acres of the said southwest quarter and that the defendant Eleanora M. Schneider claims to own the west 90.20 acres of said southwest quarter, and that a controversy has arisen between plaintiffs and the defendants as to the true construction of the will of said Tim Hoyne; that immediately after the death of Tim Hoyne, the son William took open and notorious possession of the east 85.10 acres of said southwest quarter and since that time he and the plaintiffs have been in open and exclusive possession of said 85.10 acres. The prayer is for a judgment construing said will and a determination of the rights of the parties in and to said lands so that each will know just how many of the acres in said quarter sections are owned by plaintiffs and the defendant, etc.

The defendant admits that Tim Hoyne owned the lands in question and left a will as above outlined. She alleges that she owns the west half of said southwest quarter and that it contains not less than 90.20 acres and that no part thereof is the property of the plaintiffs; that she is entitled to the immediate possession of the whole of the west half of said southwest quarter and the acreage thereof as determined by the government survey and that plaintiffs unlawfully keep her out of possession of a small part thereof. She asks that she be adjudged to be the legal owner of and entitled to the immediate possession of the west 90.20 acres of the southwest quarter of section 18, etc.

The evidence offered showed the facts recited. The county engineer was called as a witness and testified concerning a survey he had made. He produced from his office records the government field notes, map and official plat of section 18, all of which were duly identified and admitted. These documents show that the sec-

tion contains 660.32 acres; that the northwest quarter of the northwest quarter contains 45.05 acres; the southwest quarter of the northwest quarter 45.07 acres; the northwest quarter of the southwest quarter 45.09 acres, and the southwest quarter of the southwest quarter 45.11 acres. (Addition will show that these fractional tracts total 180.32 acres, which, subtracted from the total of 660.32 acres, leaves 480 acres for the remainder of the section.) The west half of the southeast quarter contains 80 acres and the east half of the southeast quarter contains 80 acres. The county engineer further testified with reference to making a survey, to finding stones at appropriate places, that all section corner stones were found, as well as the quarter corners on the north and west, the others being established, and explained that this section is on the west side of the township and in a government survey any shortage or overrun is on the west and north of the township; that the government in making the survey set the section corner and quarter corners, but did not set other corners in the field though it did in the field notes. In making the survey he found the southwest quarter actually contained 170.52 acres rather than the 170.20 acres called for by the government survey, and that according to the regulations he had prorated the excess, which gave the east half of the southwest quarter 80.18 acres and the west half of the southwest quarter 90.34 acres. Defendant also offered a book put out by the General Land Office entitled "Lost or Obliterated Corners and Subdivisions of Sections," and, among others, the following quotation therefrom:

"80. Subdivision of Quarter Sections Into Quarter Quarters.—Preliminary to the subdivision of quarter sections, the quarter quarter corners will be established at points midway between the section and quarter section corners, and between quarter corners and the center of the section, *except on the last half mile of the lines closing on the north or west boundaries of a township, where they should be placed at 20 chains, proportionate measurement, to the north or west of the quarter section corner.*" (p. 22.) (Italics ours.)

In addition to the above, it was shown William Hoyne contracted to sell his land. He described himself as an heir under the last will of Timothy Hoyne and contracted to sell the east half of the southwest quarter of section 18, township 14, range 3, according to the government survey. This contract was never carried out. It was shown John Hoyne sold the west half of said southwest quarter to Thomas Hoyne, who in turn sold it to the National Bank of America, which in turn sold to Eleanora M. Schneider, whose deed states the description contained 90 acres more or less.

The trial court found for the plaintiffs and ordered that the boundary line between the east half and the west half of said southwest quarter should be and is at a point equidistant between the east line and the west line of said quarter section, and that plaintiffs are owners of 85.29 acres and defendant is the owner of the west 85.28 acres of said quarter section and barring each of the parties from land set off to the other. Defendant's motion for a new trial was overruled, and she appeals.

Before taking up appellant's contentions, the reason given by appellees to justify the correctness of the court's order will be noticed briefly. They say that Timothy Hoyne in his will gave John Hoyne the west half and William Hoyne the east half of said quarter section, and that each took one-half in quantity, and—

"As we understand the rule, the words, 'one-half' is construed to mean one-half in quantity, unless the context of the instrument in which it is used, or other surrounding circumstances, changes the construction so that the words in question were used in some other meaning."

On the other hand, the appellant contends that the terms "east half" and "west half" had reference to the government survey, and that what John Hoyne and William Hoyne received under their father's will is to be determined by reference to such survey. It will be noted that there is no dispute about what the government survey shows; that there is a total of 170.20 acres called for by the field notes, and that owing to some overrun on the ground the county engineer computed the total acreage as 170.52 acres. Neither is there any dispute that according to the government survey there is in the west half of said southwest quarter 90.20 acres as called for in the notes, and in the east half of said southwest quarter 80 acres as called for in the notes, and that in the west half of the southeast quarter there is 80 acres and in the east half of the southeast quarter there is 80 acres, and that the field notes specify the east-and-west widths of the respective tracts on their southern boundaries as 22.56, 20, 20 and 20 chains. It may be remarked that appellees have appealed from the survey, although they offered it in evidence in this case. The proposition is solely what lands plaintiffs' ancestor William received from his father and what lands defendant's mesne grantor, John Hoyne, received, under the description used in the will of the father.

As appears from the Manual of Surveying Instructions for the Survey of Public Lands of the United States, and Private Land

Claims, published as of January 1, 1902, Congress in 1805 directed the subdivision of public lands into quarter sections, and in 1820 provided for the sale of public lands in half quarter-sections, the act providing:

"In every case of the division of a quarter section the line for the division thereof shall run north and south . . . and fractional sections, containing 160 acres and upward, shall, in like manner, as nearly as practicable, be subdivided into half quarter-sections, under such rules and regulations as may be prescribed by the secretary of the treasury, . . ." (p. 7.)

In 1832 provision was made directing the subdivision of the public lands into quarter quarters, the act providing that fractional sections should be subdivided under rules and regulations prescribed by the secretary of the treasury. In 1849 the department of the interior was established and the land office was transferred from the treasury department to the department of the interior.

The first statute of the United States with reference to the survey of the public lands was enacted in 1796, but prior thereto and in 1784 the Continental Congress had made provisions for locating and disposing of lands in the western territory. Title 43 U. S. C. A., ch. 18, contains the law with reference to survey of public lands.

The 5th paragraph of section 751 of that title provides that—

"Where the exterior lines of the townships which may be subdivided into sections or half-sections exceed, or do not extend six miles, the excess or deficiency shall be specially noted, and added to or deducted from the western and northern ranges of sections or half-sections in such township, according as the error may be in running the lines from east to west, or from north to south; the sections and half-sections bounded on the northern and western lines of such townships shall be sold as containing only the quantity expressed in the returns and plats respectively, and all others as containing the complete legal quantity."

The second and third paragraphs of section 752 recite as follows:

"The boundary lines, actually run and marked in the surveys returned by the Field Surveying Service, shall be established as the proper boundary lines of the sections, or subdivisions, for which they were intended, and the length of such lines, as returned, shall be held and considered as the true length thereof. And the boundary lines which have not been actually run and marked shall be ascertained by running straight lines from the established corners to the opposite corresponding corners; but in those portions of the fractional townships where no such opposite corresponding corners have been or can be fixed, the boundary lines shall be ascertained by running from the established corners due north and south or east and west lines, as the case may be, to the watercourse, Indian boundary line, or other external boundary of such fractional township.

"Each section or subdivision of section, the contents whereof have been returned by the Field Surveying Service, shall be held and considered as containing the exact quantity expressed in such return; and the half-sections and quarter-sections, the contents whereof shall not have been thus returned, shall be held and considered as containing the one-half or the one-fourth part, respectively, of the returned contents of the section of which they may make part."

And section 753 recites as follows:

"In every case of the division of a quarter-section the line for the division thereof shall run north and south, and the corners and contents of half quarter-sections which may thereafter be sold, shall be ascertained in the manner and on the principles directed and prescribed by the section preceding, and fractional sections containing one hundred and sixty acres or upwards shall in like manner as nearly as practicable be subdivided into half quarter-sections, under such rules and regulations as may be prescribed by the secretary of the interior, and in every case of a division of a half quarter-section, the line for the division thereof shall run east and west, and the corners and contents of quarter quarter-sections, which may thereafter be sold, shall be ascertained as nearly as may be, in the manner, and on the principles, directed and prescribed by the section preceding; and fractional sections containing fewer or more than one hundred and sixty acres shall in like manner, as nearly as may be practicable, be subdivided into quarter quarter-sections, under such rules and regulations as may be prescribed by the secretary of the interior."

In the above-mentioned Manual of Surveying Instructions promulgated under authority of the public lands acts of the United States, provision is made under section 233 for official township plats and for the marking by number in all cases where lots cannot properly be designated as quarter quarters, and recites:

"Those fractional lots which are not susceptible of being described according to relative local position will be numbered in a regular series; those bordering on the closing boundaries of a township to be numbered progressively from east to west or from north to south in each regular section."

The federal statutes likewise make provision for certified copies of the surveyor's field notes, the surveys and plats being made a part of the records of the state. The survey in the present case was made in 1858. The dates the particular patents above referred to were issued were May 1, 1873, as to the south half and May 15, 1880, as to the north half of the particular quarter section involved. It is well known that all of the lands in Kansas were surveyed by the United States and were practically all opened for preëmption and later for homestead entry. In the greater number of conveyances of rural lands which have been made, the descriptions of the lands conveyed have used the nomenclature commonly used in describing the

lands according to the government surveys. The particular question in this case is whether Timothy Hoyne intended by his will to divide the southwest quarter in controversy in equal quantitative shares or whether he intended it to go according to the government surveys.

In 4 Thompson on Real Property, section 3153, is the following:

"The word 'half' when used in describing land, should be construed as meaning 'half in quantity,' unless the context or surrounding facts and circumstances show a contrary intention. It was so held in a case where two tenants in common of a parcel of land, ·which could not be equally divided by a north-and-south line drawn equidistant from its east-and-west lines, conveyed to each other the 'east half' and 'west half' respectively of said parcel, containing an equal number of acres, and without reference to the 'government survey.'

"But in government surveys of the public lands the terms 'east half' and 'west half' are used, not with reference to quantity, but to a line equidistant from the boundary lines of the parcel subdivided, and those terms have the same signification in patents issued by the government; and this is true because so provided by act of congress. A deed of the 'east half' of a parcel of land 'according to the United States survey' is definite, and excludes the idea of two equal quantities, and fixes the dividing line equidistant from the boundary lines of the parcel thus subdivided.

"In the description of land under government surveys, if part of a section or of a quarter section be described as the 'north side' or the 'north end,' the words may be taken to mean the north half of the section or quarter section. 'The term "eastern one-half," in a deed conveying one-half of a tract of land, in the absence of admissible parol evidence disclosing a different intention, would mean the eastern half, formed by a line to be run due north and south through the tract; but if it appears that before the deed was executed a division into two parts, supposedly equal in area, had been made by a line, having a different bearing actually marked on the ground by stakes and fences, according to which possession had been held for a number of years, and the parties have since held possession according to such line, the words must be taken to mean the eastern one-half as so laid off and held in severalty.' "

18 C. J. 292, section 269, recites as follows:

"Ordinarily a conveyance of half of a tract of land will be construed as a conveyance of a half in quantity, but there is no universal rule that it shall be so interpreted; and where the intent of the parties to employ the term 'half' as describing a particular tract other than a half in quantity is apparent from the context or surrounding facts and circumstances, it will be given such meaning. So where a tract has previously been in some manner divided into two parts of approximately equal size, the usual presumption is that one of these parts is referred to. Where the description of a parcel forming part of a larger tract is otherwise sufficient, an inaccuracy in the statement of the proportion between the area of the parcel and that of the entire tract does not affect the title conveyed.

"Where a tract is divided by a line of the government survey, the term 'half' will ordinarily be referred to one of the parts so made. A conveyance of one half of a lot or forty-acre tract formed by the government survey will not, however, be presumed to intend a further subdivision of such lot by an extension of the method of subdivision by which it was created. And further, where the entire description is given effect by this construction, the word 'half' may be taken as meaning half in quantity without regard to the half as determined by the government survey."

In 4 R. C. L. 120 it is said:

"Whenever land is described as the fraction of any subdivision—as, for instance, the southeast fractional quarter of a section—the rule of the construction which is applied will prohibit any extension of the grant beyond the lines of such southeast quarter irrespective of any extension which otherwise would have been permitted. And where land is conveyed in sections or subdivisions of sections, in areas which have been surveyed by the United States government, a presumption arises that reference is made to the public surveys of the United States. Where, however, land was conveyed in fractions of sections, as the south half of a certain section, extrinsic evidence has been held to be admissible to show that one-half in actual area of the section was intended."

In a note as to the legal meaning of the word "half" in Annotated Cases 1913E, 1013, it is said that—

"The literal significance of the word 'half' is one of two equal parts into which anything may be divided."

An examination of the cases cited shows that where the tracts refer to government descriptions, in most of the cases the lands are irregularly shaped, as where they border on a lake or a stream. The note states that—

"Where the term is used with reference to a section or other subdivision of a government survey, it will ordinarily be held to intend the half according to the lines of such survey though inequality of quantity results therefrom."

The precise question involved in this case has not been before this court, but in the case of *Gunn v. Brower,* 81 Kan. 242, 105 Pac. 702, the question of the sufficiency of a description in a tax deed conveying a part of a fractional quarter section was the point in issue. In discussing the question the court said:

"But the language of the deed where it speaks of 'the south half' of this quarter section is open to two possible constructions. It may refer to the exact south half according to the actual acreage, or it may refer to one of the two substantially equal parts into which the quarter section is divided by the east-and-west line of the government survey. If it is impossible to tell which is intended the deed may be void for indefiniteness. Where there is nothing to suggest the contrary the word 'half,' in connection with the con-

veyance of a part of a tract of land, is interpreted as meaning half in quantity. (*Owen v. Henderson,* 16 Wash. 39; *Cogan v. Cook,* 22 Minn. 137, 142; *Hartford Mining Co. v. Cambria Mining Co.,* 80 Mich. 491; *Jones v. Pashby,* 62 Mich. 614.) But where a tract has previously been in some manner divided into two parts of approximately equal size the usual presumption is that one of these parts is referred to.

" 'The words "east half" and "west half" in a deed, while naturally importing an equal division, may lose that effect when it appears that at the time some fixed line or known boundary or monument divides the premises somewhere near the center, so that the expression more properly refers to one of such parts than to a mathematical division which never has been made. The expression in the deed is controlled by the situation existing upon the premises themselves, and the manner of their use, and the monuments and boundaries existing.' (*People v. Hall,* 88 N. Y. Supp. 276, 279.)

"(See, also, *Grandy v. Casey,* 93 Mo. 595; *Schmitz v. Schmitz,* 19 Wis. [*207] 222.)

"This principle is applied where one of the lines of the government survey effects such a division. (*Prentiss v. Brewer,* 17 Wis. 635. See, also, *Eddinger v. Woodke,* 127 Mich. 41; *Kinsey et al. v. Satterwaite,* 88 Ind. 342; *Turner v. The Union Pacific Ry. Co.,* 112 Mo. 542, 545.) It is not carried so far, however, as to involve an assumption that one who conveys the half of one of the smallest governmental subdivisions—a lot or a 'forty'—intends anything else than a division into equal parts. He is not presumed to have in mind a further partition of this surveyor's unit—the smallest 'legal subdivision' (*Hopper v. Nation,* 78 Kan. 198)—by an extension of the method by which it was created. (*Cogan v. Cook,* 22 Minn. 137, 142; *Jones v. Pashby,* 62 Mich. 614.) Possibly the rule referred to ought not to apply to tracts that are 'fractional' in the sense that they are irregular in shape because of the existence of a body of water or some other like obstacle, so that they can conform to no general rule. (*Goltermann v. Schiermeyer,* 111 Mo. 404, 416.) But it is rightly invoked in such a case as this, where the only irregularity is that common to practically all tracts along the northern and western boundaries of a township. Lot 4 of section 7 is commonly and intelligibly described as 'the southwest quarter of the southwest quarter,' just as the 'southwest quarter' itself is designated by that term notwithstanding its area is less than 160 acres. We hold that the deed to 'the south half of the southwest quarter' passed title to lot 4 and the south half of the east half of the southwest quarter." (p. 243.)

As has been noted, appellants contend that the will intended to convey the lands according to government survey and appellees contend an equal division was intended. The testator owned all of the land in the south half of section 18, and under the devises to his four sons, had the half-section contained exactly 320 acres, each would have received 80 acres. If it be held that he intended to give each of them the same quantity of land, then to be fully consistent the excess in the west side would have to be apportioned among the

four sons, not merely between the two taking lands in the southwest quarter. And, if it be so held, no one would have taken according to the government survey, and the boundaries of what they received would, in no case, have coincided with the points fixed by such survey. As called for by the government plat, the south half of the section contains 330.20 acres and the southwest quarter of the section contains 170.20 acres. Appellees, however, make no argument about the lands in the southeast quarter, possibly for the reason that if the same be taken into consideration, they would receive only one-fourth of 330.20 acres or 82.55 acres, rather than one-half of 170.20 acres or 85.10 acres. There is nothing about the will that indicates the father intended that the entire south half should be divided into four equal quantitative parts. Can it be said that he intended the southwest quarter to be divided into two equal quantitative parts? Attention has been directed to the fact that in his will he described the lands according to United States survey terminology. That terminology furnishes a guide for determining what lands he devised and their location. He did not say the lands were in Saline county—he described them by a section, township and range west of the sixth principal meridian. Perhaps it might be said that the use of such descriptions did not indicate his intention with reference to division. However, he had obtained patents to the lands which showed that on the west side of the south half of the section there were excess lands, and he could not be ignorant of the fact that when the lands were surveyed and plats prepared the west half of the southwest quarter was shown to contain 90.20 acres and the east half to contain 80 acres, and that the field notes set forth figures as to distances which would contain such acreage. Had he intended to divide the entire south half of the section quantitatively equally among his four sons, or the southwest quarter quantitatively equally between his two sons, he could easily have expressed that intention. Under all the facts we are of the opinion that Timothy Hoyne intended, by the descriptions of real estate used in the various devises in his will, to refer to subdivisions according to the government survey, and that as to his sons John Hoyne and William Hoyne he did not intend an equal quantitative division of the southwest quarter of section 18. While not conclusive here, evidently the plaintiffs' ancestor, William Hoyne, believed that he took according to the government survey, otherwise he would not, in a contract of sale of it, have said:

"By said will said William Hoyne inherits the east half of the southwest quarter of section eighteen (18), township fourteen (14), range three (3) west of the sixth p. m. in Saline county, Kansas, *according to the government survey.*" (Italic ours.)

Appellees call our attention to *Wood v. Mandrilla,* 167 Cal. 607, 140 Pac. 279, wherein a different conclusion was reached. In that case the court held there was no survey dividing or segregating the fractional quarter section into any lesser subdivisions and that the field notes showed a continuous, unbroken line of survey along the south line of the fractional quarter from the southeast to the southwest quarter, and the absence of any monuments or corners established thereon; that there was no provision in the law requiring the subdivision of a quarter section, and that if it were subdivided it was not properly so done, and that no tract of land known and designated as the east half of the quarter section was ever surveyed or segregated by a government survey. Under the facts as they appear in our case, a different conclusion must be and has been reached.

To sum up, we hold that under the facts, in devising the west half of the southwest quarter of section 18 to his son John, and the east half of the southwest quarter to his son William, Timothy Hoyne intended they should take the lands as indicated by the field notes and plat of the government survey, and did not intend an equal quantitative division between them.

It appears from the record that an appeal to the district court has been taken from a survey made in December of 1931. The matter of such survey, the correctness thereof, a determination that there is land in the southwest quarter in excess of that called for by the field notes and plat is not before us. When that appeal is disposed of, a disposition must, if the appeal is denied, be made of such excess lands.

The judgment of the lower court is reversed, and the cause remanded for further proceedings consistent herewith.

HUTCHISON, J., not sitting.